**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 96-21043**
_____


**MANUFACTURING MANAGEMENT SYSTEMS, INC.,**

**Plaintiff-Appellant,**

**versus**

**CAMSHAFT MACHINE CO.,
WOLVERINE GEAR & PARTS CO.,
CTG OPERATIONS, INC. and CRANE CAMS, INC.,**

**Defendants-Appellees.**

_____

**Appeal from the United States District Court
for the Southern District of Texas
(H-95-CV-5431)**
_____

August 25, 1997

Before WISDOM, DUHÉ, and BARKSDALE, Circuit Judges.

PER CURIAM:[1]

At issue is whether a contract for joint development of a new version of a computer program implicitly, but unambiguously, allows one of the parties to keep a copy of the newly developed program for private use upon termination of the agreement. On cross-motions for summary judgment, the district court granted judgment

---

[1] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

for the defendants, finding that the contract so allowed. Because, we conclude that the contract is ambiguous on this point, we **REVERSE** and **REMAND**.

## I.

Manufacturing Management Systems (MMS) developed a successful computer program called the Capacity Management System (CMS). This program was written for a specific computer. It could not run on any others, including an IBM 38.

Camshaft Machine Co. had an IBM 38; again, a computer with which the CMS was incompatible. Camshaft proposed in January 1984 that it and MMS jointly develop a version of the CMS that would run on an IBM 38. The two agreed to a joint venture which covered both the development and the marketing of the new computer program. The agreement provides that Texas law controls. The other pertinent provisions of the contract follow.

The purpose of the agreement was "to mutually benefit from the development and sales of the new *System 38 CMS*, hereinafter referred to as the '*System*'". (Emphasis added.) MMS would manage and direct development of the System, would provide the necessary CMS documentation, and would write the System documentation. Camshaft would provide time on its IBM 38 computer, technical assistance, installation assistance at purchaser sites, and enhancements and modifications of the System.

- 2 -

Camshaft also agreed to assist in marketing the System; and in the section relating to the compensation to be received by Camshaft for its assistance, the contract listed a 5% commission for certain types of sales, a 10% commission for others, and compensation of $500 per day for assistance in on-site installations. This section does not list a free copy of the System as part of Camshaft's compensation.

Section 4, entitled "Title to the System", provides:

> All System sales shall be exclusively between MMS and the System purchaser. MMS shall retain ownership and title to the System and rights to software license fees paid by purchasers.

The contract states that, upon its termination, MMS shall continue to compensate Camshaft, according to the contract, insofar as such compensation was earned prior to termination. The contract does not provide for new compensation terms upon its termination, and does not state that, upon termination, Camshaft could retain a copy of the System.

Section 7 requires each party to retain the confidentiality of information received from the other, "and to make not further use of such information". That section also requires Camshaft, upon termination, to "return to MMS all CMS source codes, object codes, program listings and technical documentation in the possession of Camshaft". The parties agreed not to assign any of the rights they held under the agreement.

In 1993, Camshaft requested MMS' approval of an assignment of Camshaft's rights under the agreement to CTG Operations. MMS refused and proposed a new agreement, which CTG rejected. (Camshaft sold its assets to CTG in 1994.) MMS terminated the agreement in 1995 and requested the return of all CMS materials, *including all System 38 CMS materials*, along with a confirmation that Camshaft had discontinued use of the System. Camshaft returned nothing.

As of the filing of this action by MMS in 1995 for breach of contract, conversion, fraud, and negligent misrepresentation, Camshaft had been using the System internally for close to ten years. The defendants (Camshaft, CTG, Crane Cams as parent company of CTG, and Wolverine Gear & Parts Co.[2]) removed the action to federal court. Both sides moved for summary judgment.

Camshaft and the other defendants contended, *inter alia*, that the contract stated that, upon termination, Camshaft (or its successor) was only required to return to MMS the CMS source codes, program listings and technical documentation; and that MMS had already received the consideration for which it had bargained — the

---

[2]     MMS states that the defendants other than Camshaft "are in the case only because of a corporate acquisition". And, although the district court noted that "[MMS'] Original Complaint does not raise allegations against Defendant Wolverine Gear & Parts Company ... and that [MMS'] response in Opposition to Defendants' joint Motion for Summary Judgment raises no allegations against Wolverine", it did not dispose of any of MMS' claims on that basis. The liability *vel non* on the part of each defendant is for the district court on remand.

development of the System.  In its cross-motion, MMS contended that the requirement to return the CMS materials included the System materials, in that the System was just one version, a subset, of the CMS.

The district court granted summary judgment for the defendants, concluded that the return-CMS-materials requirement did not include the System.

## II.

MMS appeals both the summary judgment awarded defendants and the denial of its similar motion.  It requests that we find breach of contract and conversion and remand for ancillary matters, such as damages.  It does not appeal the dismissal of its fraud and negligent misrepresentation claims; it has abandoned those claims.  On remand, only the breach of contract and conversion claims remain.

Pursuant to our *de novo* review of a summary judgment, *e.g.*, *Vera v. Tue*, 73 F.3d 604, 607 (5th Cir. 1996), we apply the same standard as the district court.  As the parties agreed, Texas law applies.

The primary question for review of a summary judgment on a contract claim is whether the contract's terms are unambiguous; we can determine whether a party is entitled to summary judgment only if they are.  *Coker v. Coker*, 650 S.W. 2d 391, 393 (Tex. 1983) ("When a contract contains an ambiguity, the granting of a motion

for summary judgment is improper because the interpretation of the instrument becomes a fact issue").

Appellees' contention that we are barred from finding the contract ambiguous because both sides contended in district court that the contract unambiguously supported their positions misunderstands our role in reviewing a contract-based summary judgment. It is true that a "disagreement regarding the meaning of a clause in a contract does not render the clause ambiguous". *First City Nat'l Bank of Midland v. Concord Oil Co.*, 808 S.W. 2d 133, 136 (Tex. App.--El Paso 1991, no writ). But, we review each of the motions anew. Based on the contract, we may refuse summary judgment, despite the parties' contending, as they do here, that the contract is unambiguous. In other words, we can conclude that it *is ambiguous*.

A contract is unambiguous if it can be given a certain or definite legal meaning or interpretation; conversely, it is ambiguous when its meaning is uncertain and doubtful, or it is reasonably susceptible to more than one meaning. *Coker*, 650 S.W. 2d at 393; *see also* *Purvis Oil Corp. v. Hillin*, 890 S.W. 2d 931 (Tex. App.--El Paso 1994, no writ) (ambiguity determination to be made in the light of the circumstances at the time of the contract formation). Of course, although we look to the intent of the parties to determine the meaning of a contract, that intent must be such as is expressed in the terms of the agreement. *Cap Rock Elec.*

- 6 -

*Coop., Inc. v. Texas Utilities Electric Company*, 874 S.W. 2d 92, 98 (Tex. App.--El Paso 1994, no writ). And, we may apply many of the usual rules of construction before declaring a contract ambiguous. *City of Pinehurst v. Spooner Addition Water Co.* 432 S.W. 2d 515, 519 (Tex. 1968); *see also* **Austin Hardwoods, Inc. v. Vanden Berghe**, 917 S.W. 2d 320, 323 (Tex. App.--El Paso 1995, writ denied) (the court will attempt to determine objective intent of parties through harmonization of all provisions so no provision rendered meaningless).

Turning to the contract at issue, with this standard for its interpretation in mind, we note preliminarily that the instrument does not expressly grant Camshaft the right to keep a copy of the System for its use. Not only does this omission require us to find a new term of the contract "unambiguously" by negative inference from the rest of the contract's terms, it also requires us to consider whether, as posited by MMS, the contract instead unambiguously *precludes* Camshaft's retention of a copy.

The first question, then, is whether it would have been natural for the parties to have included such compensation (retention of the System) in the agreement had they intended it to be a term of the agreement. The contract contains a detailed list of all of the types of compensation to be received by Camshaft for the donation of its computer time and technical advice. The contract lists commissions on sales for which Camshaft is partially

responsible; it also provides that Camshaft will be compensated for assisting in the installation of such programs at the purchasers' places of business.  Despite this extensive explanation of what rewards will be received for what performances, there is *no* mention of a free copy of the System.  In the light of the fact that, while the other types of compensation are mere possibilities in terms of when they would be received by Camshaft (they would all be dependent on System sales), and yet the compensation in the form of a free copy of the System would be a certainty (depending only on the successful conversion of the CMS), it would seem that the parties would naturally list such compensation, a free copy, somewhere in the contract, most likely in the section labeled "Compensation".  They did not.

Furthermore, while the declarations at the beginning of the contract list the parties' intentions and desires, including selling copies of the System, this list does not include Camshaft's desire to use the System to manage its own operations.  Again, the parties saw fit to include some fairly finer aspects of the agreement, such as exactly what Camshaft was willing to offer to the deal, including exactly to which type of computer MMS was allowed access in order to complete the conversion, and yet we are asked to conclude that the parties simply omitted their intention for a copy of the System to be given Camshaft upon termination.

Needless to say, if the parties had intended such a provision, they certainly could, and should, have included it.

On the other hand, this is not to say that the contract unambiguously supports MMS' position. Perhaps the parties did agree implicitly to such compensation; the language of the contract explaining the rights and obligations of the parties upon termination of the agreement might allow for such a reading. Moreover, the fact that, under the contract, Camshaft had the use of a copy of the System, throughout the life of the agreement could militates in favor of such a reading.

The contract grants to MMS all title to the System. This section, quoted above in full, consists of only two sentences and falls under the heading "Title to the System". Although one of the two sentences in this section deals with sales of the System to third parties, the other, final, sentence states in general terms that "MMS shall retain ownership and title to the System". This would appear to grant, unambiguously, full title not to Camshaft, *but rather to MMS*. Camshaft attempts to counter this provision by contending that the apparently general language of title must be read in the light of the preceding language/sentence dealing only with System sales, and that we must therefore conclude that the parties were only talking about title *with respect to sales*, while, on the other hand, Camshaft retained title with respect to its use

of one copy of the program.  There are two problems with this contention, both insurmountable.

First, while the first/preceding *sentence* may speak of sales, the *heading of the section* deals with title generally, without limitation.  While it is plausible that the first/preceding sentence might color our reading of the sentence that follows, that coloring must give way to such an explicit statement in the section heading.  In other words, the express intent of a section heading cannot be implicitly limited merely by including a sentence in that section limited to only one aspect of the issue at hand.  The general language in the second sentence retains its generality; and, under that umbrella, MMS would retain title to the System. *See, e.g., **Vail v. Henry S. Miller Co**.*, 592 S.W. 2d 410, 411-12 (Tex. App.--Dallas, 1979 writ denied) (using section headings of contract to interpret provisions of that contract); ***Canadian River Municipal Water Authority v. City of Amarillo***, 517 S.W. 2d 572, 582 (Tex. App.--Amarillo, 1974 writ denied) (same).

Second, the canon of construction on which Camshaft and the other appellees rely in contending that the first/preceding sentence should limit our reading of the sentence at issue is the rule of *ejusdem generis*: if words of a specific meaning are followed by general words, the general words are interpreted to mean only the class or category framed by the specific words.  This canon, however, applies only when the contract *has already been*

*found to be ambiguous.* **Hussong v. Schwan's Sales Enterprises, Inc.**, 896 S.W. 2d 320, 325 (Tex. App.--Houston (1 Dist.) 1995, no writ); **Corpus Christi v. Bayfront Assoc. Ltd.**, 814 S.W. 2d 98, 104 (Tex. App.--Corpus Christi 1991, writ denied). In other words, by contending that assessing the meaning of the first/prior sentence is required to fully understand the meaning of the second/final sentence granting title to MMS, Camshaft has implicitly admitted that the section is ambiguous absent such a construction. We agree. The section is ambiguous with respect to the scope of applicability of the sentence retaining System title in MMS.

At long last, we arrive at the primary basis for Camshaft's contention that the contract grants it a copy of the System. Upon termination, Camshaft is directed in section 7 to "return to MMS all CMS source codes, object codes, program listings and technical documentation in the possession of Camshaft". Camshaft contends that, because *the System* is distinct from *the CMS*, the foregoing CMS return requirement implicitly allows keeping one copy of the System for Camshaft's continued use. Perhaps, but not necessarily.

Part of the foundation for this contention, that the System is treated as distinct from the CMS by the rest of the contract, is dubious. The declarations at the beginning of the contract describe the System as "the new System 38 CMS". This would appear to mean that the System is in fact a CMS, and the requirement of

the return of all of the CMS materials would therefore naturally include the System.

Furthermore, the contract states that, upon termination, Camshaft shall make no further use of the technical documentation of the System and no use of any of the confidential information received from MMS. It is difficult, at best, to read this provision in harmony with an implied provision allowing Camshaft to retain and utilize a copy of the System. *See* **Purvis**, 890 S.W. 2d at 935 (court must attempt to "harmonize all provisions" of contract in its interpretation). Discontinuing use, in a natural language interpretation of the contract, must mean exactly that; Camshaft may no longer use the information, including use on Camshaft's computer to manage its operations.

Camshaft offers nothing to contradict this, and we are left with the conclusion that inferring otherwise would contradict the requirement to discontinue use of the System technical documentation and the other confidential MMS information. On remand, perhaps, Camshaft can adduce evidence that the program might be used without reference to the technical documentation or to other confidential information; but, on this record, this point involves a genuine issue of material fact -- the dreaded death knell of summary judgment.

As stated, we must read a contract to "harmonize and give effect to all the provisions of the contract so that none will be

rendered meaningless". ***Coker***, 650 S.W. 2d at 393. A reading of this contract which allows Camshaft to retain a copy of the System certainly puts several other provisions in obsolescence. In particular, the terms requiring Camshaft to retain the confidentiality of all information acquired from MMS, and the provision retaining title to the System in MMS would be under threat in the light of the rest of the contract.

It is safe to assume that MMS already has its own copies of both the CMS generally and the System in particular. Camshaft's return of the CMS materials, then, could not be for the purpose of getting a copy into MMS' hands. Furthermore, Camshaft is expressly forbidden to sell either the System or the CMS to anyone after the contract is terminated. It is also not allowed to divulge for free any of the information it has received. Return of the CMS materials therefore cannot be for the purpose of retaining the confidentiality of those materials — that has been taken care of in other provisions. Thus when read in the context of the rest of the contract, the only way for the section requiring the return of the CMS materials to have effect on the parties' positions upon termination of the agreement is if the section intends to get the materials out of Camshaft's hands altogether, in order to prevent use by Camshaft.

If this is so, then the return of only the original CMS program, and not the System, is meaningless, because Camshaft does

not need the old CMS; its IBM 38 computer cannot use that version. It would need to keep a copy of "the new System 38 CMS", the only version of use to it. Therefore, for the return language of the contract to have meaning, it must include the System. Holding otherwise would render that section meaningless to the parties, and such a reading must give way to a reading which gives the provision effect.

Perhaps on remand, Camshaft and the other defendants can adduce evidence that use of one copy of the System to manage their operations would not interfere with an effective return of all CMS material, perhaps including the System 38 CMS material.

## III.

For the foregoing reasons, the summary judgment awarded Camshaft Machine Co. and the other defendants is *REVERSED*; the denial of summary judgment to Manufacturing Management Systems, Inc., is *AFFIRMED*; and the case is *REMANDED* for further proceedings.

*AFFIRMED IN PART; REVERSED IN PART;* and *REMANDED*